Your Honor, in this case on the value of 216-0788, the people of the State of Illinois plaintiff's appellee is Kevin J. Tucek, defendant's fellow. Arguing on behalf of the defendant's fellow, Mr. Fletcher E. Amell. Arguing on behalf of the plaintiff's appellee, Mr. Larry J. Carlson. Mr. Amell, you may proceed. Did both parties receive our note to the point? I did.  Good morning, Your Honors. My name is Fletcher Heine. I represent the defendant, Kevin Tucek. Here to please the Court, Counsel. So the issue in this case is whether the defendant's first-stage post-conviction petition stated just of a claim that his guilty plea was the result of ineffective assistance at counsel. And then within that claim, there are two, basically two disputed points. One being whether or not Padilla and Hughes required counsel to advise the defendant of the sex offender mandatory supervisory release requirements. And then secondly, whether or not the defendant sufficiently pled prejudice in that but for counsel's lack of advice, he would not have entered into the guilty plea. And I believe that McCoy speaks to the second question, so I'll start there. You know, one other point. Just make sure you're close enough to the microphone. We have an issue to ask. Okay. Okay. Sorry for the interruption. I apologize. Sure. So McCoy speaks to the second question, and so I'll start there. And McCoy is distinguishable from this case on both of the relevant facts. Like this case, McCoy is a first-stage post-conviction petition from a guilty plea. However, unlike this case, the defendant, McCoy, he made a whole lot of claims. Not all of them had to do with the voluntariness of his plea. In fact, most of them did not. And crucially, what the defendant, McCoy, never alleged was that but for these allegations or these violations of his constitutional rights that he was alleging, he would not have pled guilty. And that was the first point in his court's reasoning in McCoy, you know, that this court made was he never even pled that he would not have pled guilty. In this case, and I'll read it. I wrote it out. This is page C94 of our common law record, and it's the last page of the defendant's post-conviction petition. The defendant wrote, quote, the defendant contends that had counsel advised him of the actual mandatory supervisory's term, he would not have pleaded guilty and would have proceeded to trial. But don't we need some additional facts besides that? Facts that would show the defendant's rejection of this plea bargain would have been rational under the circumstances? Well, in the first stage proceedings, I don't believe you need much more affirmative proof. What you had in McCoy was not so much that there was a lack of affirmative proof that the defendant would not have pled guilty, but there was actually the record actually moved to have refuted the defendant's claim had he made it. Well, here, I don't think you put this in your brief, but the defendant during the plea was told that at the end of his service or term in the Department of Corrections, he could be committed as a sexually violent person, which would mean he could be committed for the rest of his life. That's not in your brief. Well, that's true. But, Buddy, don't we evaluate all of the circumstances in determining whether or not he states the gist of a constitutional claim when he says he would not have pled guilty? He knew that when he finished his term, and initially he said, I was not aware of that, and the court says, let's go through that. And then the court then admonishes him, and counsel then says, Judge, we've spoken about this twice. Can I just have a second? He asks to speak to his client, and he reminds him, and Mr. Dolak, defense counsel, comes back on the record and says, Judge, I've had a chance to refresh Mr. Tuzek's recollection. I think he understands what's going on. He does remember that part of the conversation. And then the defendant reaffirms that he wants the plea, despite the fact that he could be committed for the rest of his life. Correct? Sexually violent persons act requires it. It's not automatic. It's not the same as the general circumstances. But it requires a hearing. He knows the mandatory supervisor leaves with him staying in ad infinitum. That's not automatic unless he can't find a place to stay. It's a lot closer, though. The mandatory supervisor leaves term unless he affirmatively comes up with a place to live. He will not be released. If it's a sexually violent person's petition, a petition has to be filed. There is a burden of proof. He gets counsel. He has a hearing. And then I don't remember the burden, if it's reasonable. No, it is. I think it is. So there's all those safeguards in between what the defendant sentenced and actually being committed. And, of course, he would have the opportunity to get himself out under the SVP Act as well. So being advised of that act does not inform him of these mandatory supervisor release requirements, which are different and are more enmeshed in the criminal prosecution as were our SVP provisions. So I don't believe that that admonishment sufficed. But was this a direct consequence plea based upon Hughes? No. It's not? It's not. At this point, under Hughes and under Padilla, direct consequences, you know, it's not even really clear if the direct collateral consequence dichotomy is even going to last. But what matters under Hughes, because the SVP Act is obviously not a direct consequence either. It's also a collateral consequence, as are the immigration consequences under Padilla. So, you know, so you're looking at, you know, severity and the certainty. Severity from the perspective of the defendant and the certainty from the perspective of counsel in that, you know, counsel's ability to predict this is going to be an issue and then the severity for the defendant and how, you know, how much would it affect his calculus in deciding whether or not to plead guilty. And those two factors both apply in this case at least as much as they did in Hughes. You think? I do. As I just said, you know, neither under Hughes or in this case, whether the SVP Act or the MSR, neither one results in the certainty of lifetime imprisonment or commitment. But what's certain, though, is that he is put at risk. And that was true in Hughes as it is here. It's identical, really. Well, actually, it's more so here because here it's enmeshed in the proceeding. It's, you know, part of his sentence. There's not a separate petition. There's not a separate burden of proof. There's not the right to counsel. There's just, you know, it's just, you know, does the Prison Review Board approve his residence? So here it's closer. You know, there's more certainty here than there was in Hughes. And, you know, obviously the Supreme Court in Hughes already said that that was enough. And then as far as severity goes, it's basically the same. It's the potential for lifetime imprisonment. Well, his potential for the plea was 6 to 50, correct? It would have been 6 to 50 had he not pled. Right. And he got 8. And he got 8. So how can you possibly demonstrate that his rejection of the plea would have been rational without anything in his petition suggesting that he had a viable defense? Because at the first stage. Again, McCoy was the first stage. McCoy was first stage. McCoy had more than an absence of a defense. It also had the factual basis with the co-defendant implicating the defendant. And it had two charges that were eliminated as a result of the plea. In this case, the factual basis really does not speak to the strength of the State's case. There's really no way to know, based on our record, what the State's case would have been other than, you know, obviously the complaint would have said. We do know what the victim would have testified to at least one other act that would have come in because the defendant didn't resist the motion to present additional evidence of abuse, correct? It was not resisted. There was an outcry. There was a report. So. The State was just protecting the kid. Where's the rational decision to reject an 8-year offer when you're facing 50? Well, in part because it's not really an 8-year offer. It's 8 years to life, you know, based on how easily he can find a residence. So, you know, the maximum term that he agreed to is far greater than what he thought he was agreeing to. And so that, and the calculating, if you're talking about difference between 6 to 50 and 8, it sounds like it's a lot more when there's not this extended period beyond it that's indefinite. You know, when it becomes 6 to 50 to life or 8 to life, it's not nearly the same level of benefit that he's receiving as a result of his plea. How does a defense attorney predict that a defendant is not going to be able to have a place to live when he gets out? I mean, do they have to foresee everything down the road? Under Hughes and Padilla, the defense attorney does not have to predict that. He only has to predict that if there's a problem with the residence, he won't get out. In Hughes, the defense attorney could not predict that the defendant would actually be committed under the SBP Act. And in Padilla, the United States Supreme Court acknowledged that there would be cases where a defense counsel would not be able to tell exactly what the immigration consequences were, and held that in those cases, what counsel would still have to tell the defendant about the existence of the immigration consequences to the extent that he can. So it's true that counsel would not know, especially knowing 8 years down the road, what the defendant's living situation is. But he does know about that risk, and the defendant does not know about that risk. And the existence of that risk is a huge factor that could play into the defendant's calculus on whether or not to accept a plea. So even though the defendant may—your position, I take it, is that even though the defendant may not have stated in his petition that he had a viable defense, based upon the fact that he might get life, he was willing to take the chance anyway and go to trial? Is that your point? Correct. Yes. And that's what I think the United States Supreme Court said in the United States v. Lee about immigration, correct? Yes, I believe it is. Even if he was probably going to be guilty, he'd rather take the risk. Right, and get one juror on his side somehow. I mean, that's a possibility. So in the first stage, I think really it's a difference between McCoy and this case, where on one hand you have the record actively refuting the notion that the defendant would not have pled, versus this case where it's just silent and all you have is the defendant's claim that he did, and in the first stage you're supposed to take that as true, at least for now. And in the second stage, it is true that Hughes talks about there needing to be some sort of viable defense, but that's a direct appeal from a motion to withdraw a plea where there was an evidentiary hearing. So perhaps after the third stage, the defendant still can't point to any reason why he would not plead. That would be a problem, but at this point, for the first stage, he's pled enough. Unless your honors have any further questions, I ask that you reverse each other's order in the end for further proceedings. Thank you. Good morning, your honors. May it please the court, my name is Mary Beth Burns and I represent the people of the state of Illinois. We come before you, your honors, this morning to respectfully ask you to affirm the trial court's judgment dismissing the post-conviction petition at the first stage. How do you get around the cases that the opponent cites, Padilla, Hughes? I think, you know, in the brief we talked extensively about how Hughes analyzes Padilla, and Hughes seems to put a great deal of emphasis on the amount of certainty involved. I think what we argued and what I think probably is the biggest problem in the defense position is that unlike the Sexually Violent Persons Commitment Act, when you get into the confluence of the requirements for a mandatory supervised release and the requirements for sex offender registration, a lot of those things are done through regulatory means more than by statutory requirement. And the regulatory means are administered through the Department of Corrections and through the Prisoner Review Board. Both of those things have available administrative remedies. And my understanding is that the way the three years to life provision for mandatory supervised release is administered is that various things come into play as to whether there will actually be a legitimate outdate of three years or at some point past three years of a non-natural life, and that these things are handled through administrative remedies. I'm not entirely sure there has been enough literature, case law, or administrative review for an attorney to be able to adequately foresee with certainty what counsel here believes that a defendant should be told upfront at the point of a plea. And I think much of counsel's discussion with the court earlier is legitimately before this court. This defendant got an extremely lenient deal, probably to protect his daughter from having to testify. But he, in addition to a significantly low sentence for the nature of the conduct, he also got to serve that sentence concurrently to unrelated criminal activity in Will County. Had the defendant gone to trial and been convicted, he would have been in the same situation as to MSR, but likely after a significantly longer sentence. And even if it was the same sentence, it would likely not have been concurrent to the unrelated criminal conduct. So I think that Hughes and Padilla teach that things beyond direct consequences are now in the mix for counsel. But Hughes teaches that what counsel has to present has to have a degree of certainty so that counsel can legitimately advise his client on what's the best course of action. In this situation, it would be hard to have a better outcome than what the defendant received. And although the defendant is proceeding through the Post-Conviction Hearing Act, his more likely remedies as far as his ultimate release and as far as getting housing and stuff are probably all through the administrative system. And I say that with some hesitation because I know in an earlier case that I was researching with a similar issue, I would think the most natural remedy would be mandamus. But I want to say that in some case the Illinois Supreme Court felt that mandamus required more certainty and so the Illinois Supreme Court didn't necessarily encourage mandamus. But I still think administrative remedies are probably the place to go. I also would have to disagree with counsel as to his reading of case law which says that to show prejudice, counsel would seem to feel that at least at stage one of mere allegation that there would be a defense is sufficient. I've yet to see case law that says that mere allegation is sufficient. The case law says mere allegation is in fact not sufficient. And there has to be an allegation of a viable defense. And here it's hard to say that there would be a viable defense where during the proceedings, the state requested and received permission to bring in the child's statements at a 11510 hearing. So there has to have been an outcry and there has to have been legitimate evidence contrary to any position of innocence. So our position has to be that the mere allegation is not sufficient even at stage one. In light of these facts. In light of these facts, correct, Your Honor. And truly it's hard, and I don't want to go beyond the facts particularly, but where you've got a great deal of case law that says mere allegation is not enough, then it's very hard to take the position even at stage one unless you have an entirely bare record that mere allegation could ever be enough. There has to be, even at stage one, a cognizable claim. Do Your Honors have any other questions?  Thank you. If I could just clarify, and this also will go to the severity problem under Padilla, what counsel should have told the defendant in this case? And it's pretty simple. He should have told the defendant that there are mandatory supervisory release requirements that are beyond what normal offenders have to do. And under those extended MSR requirements, the defendant would have to earn his way out of prison, and if he could not, he would be in prison for the entirety of his term, which could be natural life. Earn his way out of prison. Earn his way out of prison by demonstrating to the Prisoner Review Board satisfaction that he had a residence that complied with the sex offender requirements. Doesn't every defendant really have to earn their way out of prison? No, and there's two things that make this different. One thing that has two effects is that there's these extra requirements, and they do things like make it impossible to have halfway houses for sex offenders in Illinois because one of the requirements is you can't have two sex offenders in the same complex. So everybody else has halfway houses available to them. Sex offenders do not. They're on their own. They have to find their own private living arrangement that satisfies all these other requirements, like being not near a park or school and be suitable for electronic home monitoring and all that. So it's more, and it's more so the average offender can't expect. He could go to prison, sit there and do nothing for his time, and then when his release date comes, he will be released. I mean, it's in the name. Mandatory supervised release, not mandatory supervised stay in prison until you're on your way out. That is what's different, and that's the thing that makes it severe in this case too because we're talking about voluntariness of the plea, and we're talking about the defense calculus in deciding whether or not to plead guilty, and the fact that this is unexpected and it's not within the common understanding of mandatory supervised release or parole makes it that much more severe and that much more something that would affect the defense calculus. And to illustrate this, I don't think there's anything on the record where anybody told the defendant that if he committed another crime after being released, that he would be sent back to prison for violating his mandatory supervised release. Do they have to tell him that? Well, that's my point. My point is if he had made that claim in his petition, it would be far less persuasive than this claim. Well, is this any different? I mean, you have to tell him every possible— But this is where the difference lies, is that you tell the defendant you're going to spend the rest of your life on MSR. A defendant will understand that means I can't go out and commit more crimes or there will be consequences for me committing crimes. But when you tell him that, he does not understand that means I have to go and affirm and demonstrate to the prison review board that I need a house or that I have a house, and that means I can't go to a halfway house because I'm a sex offender. So that's what makes this different. And what makes this severe and why this is something that must be told to the defendant because it will affect his calculus. And then finally, all the case law that says that a defendant must show a defense is second stage or direct appeal cases. I can't point to a first stage case that says that he does not need to say that. State can't point to a first stage case that says he does. But going by the general rules for first stage post-conviction petition, if the defendant says it in his petition and if the record doesn't refute it, then it's true. And that's what we have here. He said it. It's not refuted. Therefore, it's enough for the first stage. And unless Your Honor has any further questions, I would ask that you reverse the judge's order and remand for second stage proceedings. Thank you. Thank you. Thank you. The court will issue a decision in due course. The court stands at recess.